IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CLIFFORD D. MARKS,                          )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )       CIVIL ACTION 18-0327-WS-B
                                            )
NEW YORK LIFE INSURANCE                     )
COMPANY, *et al.*,                          )
                                            )
        Defendants.                         )


## ORDER

This matter comes before the Court on defendant New York Life Insurance Company's Motion for Summary Judgment (doc. 64) and on defendant Alfred Corina's Motion for Summary Judgment (doc. 65). Both Motions have been extensively briefed and are now ripe.

**I.      Nature of the Case.**

This action arises from the termination of the contracts of plaintiff, Clifford D. Marks, as an insurance agent for defendant New York Life Insurance Company. Marks was a highly successful New York Life agent, consistently ranking among the company's top producers in the United States, garnering numerous awards and earning lucrative income. Marks alleges that New York Life forced him to resign because of his race (African American) in 2016. On that basis, he brings a single claim against New York Life for race discrimination in violation of 42 U.S.C. § 1981. Marks further alleges that, after his forced separation from the company, a New York Life agent named Freddie Corina made false and disparaging statements about Marks to his former clients.[1] Based on those allegations, Marks asserts a single claim against defendant

---

[1]      The specific statements identified in Marks' Complaint as the basis for his defamation claim against Corina consist of the following: (i) Corina allegedly told Marks' former clients Walter and Carol Little that Marks had "stolen millions of dollars" (doc. 1, ¶ 83); (ii) Corina allegedly told the Littles that "Marks' license was in peril and was suspended and would be revoked" (*id.*, ¶ 84); (iii) Corina allegedly told the Littles that "Marks would almost certainly face jail time because of his unscrupulous dealings" (*id.*); and (iv) Corina may have made similar statements to Marks' former clients Bobby and Sharienne Wrights (*id.*, ¶¶ 91-96).

Corina on a state-law defamation theory.  Both New York Life and Corina now move for summary judgment on the respective causes of action joined against them.

## II.    Relevant Factual Background.[2]

On April 7, 2003, Clifford Marks entered into an Agent's Contract with New York Life. (Doc. 63, Exh. A, PageID.474.)  By the terms of this Contract, Marks was authorized to solicit applications for certain New York Life insurance and annuity products.  The Contract specified that Marks would be engaged by New York Life as an independent contractor, not an employee. (*Id.*, PageID.475, § 5.)  The Contract further provided that New York Life was free to terminate the Contract without cause upon 30 days' written notice to Marks, and that New York Life could terminate the Contract immediately for cause upon written notice to Marks, for any of certain enumerated causes.  (*Id.*, PageID.476, §§ 10-11.)

Over the course of Marks' engagement as an agent for the company, New York Life occasionally issued "letters of education" or "letters of caution" to Marks for infractions concerning documentation and paperwork.  (*Id.*, PageID.689, 706.)[3]  In 2015, however, the

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment …. Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted).  Accordingly, the record will be viewed in the light most favorable to plaintiff, with all justifiable inferences drawn in his favor.  Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in [his] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

[3]    In particular, New York Life's records reflect three disciplinary incidents involving Marks prior to 2015.  First, on January 11, 2006, Marks was issued a letter of education for delivering a policy for which the insured's spouse, rather than the insured, signed on the policy receipt.  (Doc. 63, Exh. L, PageID.1391.)  Second, on June 24, 2008, Marks was issued a second letter of education for signing an application that had not been properly witnessed (*i.e.*, the proposed insured or applicant did not sign the application in Marks' presence).  (*Id.*)  Third, on September 2, 2010, Marks was issued a letter of caution when New York Life discovered blank or substantially incomplete signed forms in one of Marks' client files.  (*Id.*)

situation escalated, as New York Life received complaints from a pair of Marks' clients.  First, in August 2015, Wendell Jones alleged that he did not authorize a payment on his policy and requested a refund of premiums paid.  (*Id.*, PageID.706.)  Second, in October 2015, Howard Dean submitted a written complaint to New York Life indicating that (i) there had been "unauthorized transactions … concerning [his] bank account and life insurance policies with New York Life," and that (ii) Marks had assured him that certain paperwork would reduce his monthly life insurance payments but instead Marks established a new policy with a premium that he could not afford.  (*Id.*, PageID.705-06.)  Dean concluded his letter by writing, "I no longer want to deal with Clifford Marks as my agent."  (*Id.*)  Upon investigation, New York Life offered to rescind Dean's policy and apply the rescission proceeds to reduce the outstanding loan balance.  (Doc. 63, Exh. G, PageID.1202.)  For his part, Marks denied any responsibility or wrongdoing in connection with Jones' and Dean's complaints to New York Life.[4]

In early 2016, Jacob Robertson, Corporate Vice President and Zone Agency Standards Officer for New York Life, learned of Dean's complaint and a pattern of insurance sales by Marks that were not "persisting," meaning that the policies either were not being taken or were lapsing or being surrendered within one year after Marks took the application.  (Doc. 63, Exh. 11, ¶ 3.)  In Robertson's view, such a lack of persistency in Marks' insurance and variable product sales was a "red flag."  (*Id.*, ¶ 4.)  On that basis, as well as Marks' disciplinary history as outlined above, Robertson called a meeting with Marks in Alpharetta, Georgia on February 4, 2016, to discuss issues about apparent "overselling" and potential unauthorized transactions by Marks.  (*Id.*, ¶ 5.)  Robertson continued to harbor these concerns about Marks' performance

---

[4]     In a summary judgment affidavit, Marks avers that New York Life representatives including Dennis Farrar and Freddie Corina "induced multiple clients of mine to submit written complaints in order to force [his] resignation."  (Doc. 72, Exh. 6, ¶ 13.)  Marks identifies no basis for personal knowledge for this statement, as required by Rule 56(c)(4), Fed.R.Civ.P.  Farrar and Corina both expressly denied having solicited complaints from any former client of Marks.  (Doc. 63, Exh. B, PageID.882; doc. 63, Exh. J, PageID.1299.)  Plaintiff points to no testimony or statement from Jones or Dean (the only two clients who submitted written complaints about Marks to New York Life predating Marks' resignation) suggesting that anyone at New York Life solicited their complaints, and the Court has found none.  For all of these reasons, the Court does not credit Marks' statement in his affidavit that Farrar, Corina or anyone else at New York Life solicited or induced complaints about Marks in order to compel him to resign.

following that meeting. (*Id.*, ¶ 6.)  New York Life spent the next several months completing its review and deciding the proper course of action with respect to Marks. (*Id.*, ¶¶ 6-7.)[5]

On May 25, 2016, New York Life issued an "Agency Standards" report reflecting its decision to terminate Marks' contracts based on the following violations: "OVERSELLING; Replacements; UNAUTHORIZED POLICY TRANSACTIONS; Unsuitable recommendations; Writing or altering documents." (*Id.*, PageID.1390.)  The "Details" section of that report documented the following: (i) Dean's complaint, including specific information that Marks had him sign blank forms to lower his monthly payments, and then arranged for loans and withdrawals that Dean had never authorized or requested; (ii) Jones' complaint, including information that Marks had caused an unauthorized payment to be made on his policy; and (iii) a review of Marks' business, "which further identified quality of business, overselling and suitability concerns," misuse of forms, and the aforementioned "persistency" issues. (*Id.*)  In a statement in response, the Agency Standards report noted, Marks had denied wrongdoing with respect to the Dean and Jones matters, but "admitted that he may have oversold to some of his clients due to his exuberance." (*Id.*)  A separate New York Life internal document authored by Margaret Anderson-Miller, Corporate Vice President for Corporate Compliance, set forth the reasons for New York Life's termination decision in the following terms:

> "[A] review of his business practices raised concerns, among other things, that: (1) identified a pattern of unpaid premiums due to insufficient funds, failure to obtain policy delivery receipts and policies which cancelled soon after they had been established; (2) he reused and re-dated bank authorization forms that were previously signed by clients; (3) he instructed a customer to sign blank policy forms; and (4) he did not properly disclose traditional life insurance replacements and made recommendations that did not appear suitable for the customer."

(Doc. 63, Exh. L, PageID.1409.)

---

[5]     On summary judgment, plaintiff cites to Marks' deposition testimony that he first learned about New York Life's dissatisfaction with his performance when a colleague named Tyson Lee called Marks and informed him that a former client named Thomas Craig Stephens had told Lee of a meeting in which New York Life informed Stephens that "they were going to make sure they get" Marks. (Doc. 63, Exh. A, PageID.726.)  Defendant properly objects that plaintiff has offered no insight and no explanation as to how this facially inadmissible double hearsay could be reduced to admissible form at trial.  Accordingly, the Court declines to consider this evidence on summary judgment, pursuant to Rules 56(c)(2) and 56(e), Fed.R.Civ.P.

On June 6, 2016, Robertson sent a letter to Marks via hand delivery stating, among other things, as follows: "This is to inform you that we are terminating your Agent's Contract … dated April 7, 2003 in accordance with the provision of Section 10.  This termination is to be effective July 6, 2016."  (Doc. 63, Exh. L, PageID.1393.)  The June 6 letter did not come as a surprise to Marks; indeed, on June 3, 2016, Dennis Farrar, Managing Partner of New York Life's Mobile General Office (where Marks was assigned), notified Marks that he was being terminated and gave him the option of resigning his position in order to avoid involuntary termination.  (Doc. 63, Exh. A, PageID.425.)  Armed with that information, Marks submitted a resignation letter to New York Life, in which he wrote as follows:

> "This notice serves as my formal resignation from my position as Agent, Registered Representative, and Financial Services Professional for New York Life Insurance Company, New York Life Insurance and Annuity Corporation, and NYLIFE Securities, LLC.  Today, June 3, 2016, will serve as the last day of my employment."

(Doc. 63, Exh. L, PageID.1395.)  On June 17, 2016, Farrar sent Marks a letter confirming that New York Life was "rescinding your termination and instead we are accepting your resignation," effective that date.  (*Id.*, PageID.1397.)  In a subsequently prepared Form U-5 that was submitted to the Financial Industry Regulatory Authority ("FINRA") for regulatory purposes, New York Life explained Marks' separation from the company in the following terms:

> "Mr. Marks resigned after a review of his business practices raised a number of concerns regarding the quality of his business, including unsuitable transactions. The review was initiated after receipt of a customer complaint, which alleged unauthorized loan and withdrawal transactions relating to traditional life insurance policies.  At the time of his resignation, Mr. Marks had an outstanding debt to the company of approximately $95,000 due to commission reversals."

(*Id.*, PageID.1399.)

As a matter of policy, when agent contracts are terminated and an agent's affiliation with the company ends, New York Life routinely sends letters to that individual's former clients to notify them of the agent's separation and verify their policies or accounts.  (Doc. 63, Exh. L, ¶ 10.)[6]  New York Life adhered to that practice with respect to Marks by sending such letters to all

---

[6]      After Marks' termination, his book of business at New York Life (consisting of so-called "orphan clients") was reassigned over time by the home office in New York to established agents and council agents.  (Doc. 63, Exh. B, PageID.886-87.)  Marks' orphan clients were redistributed among a group of approximately 20-24 agents, which included agents of (Continued)

of his former clients.  Those letters included the following information: (i) a statement, without elaboration, that Marks "is no longer associated with New York Life;" (ii) a link to FINRA's BrokerCheck site, where public information about Marks and other agents could be found; (iii) a request for confirmation of the customer's account information with New York Life; and (iv) a request that the customer contact New York Life if that information was inaccurate or if "[y]ou have any concerns about the service you received from your former agent."  (Doc. 63, Exh. L, PageID.1416.)

In the months following Marks' resignation, New York Life received complaints from several of his former clients about the service he had provided, including Ellis Harper, Walter and Carol Little, Bobby Wrights and Riji Dixon.  Marks contends that New York Life representatives induced or otherwise caused these complaints to be made, and that they are meritless.  Of particular relevance to the pending summary judgment motions are the role and conduct of defendant Freddie Corina relating to these complaints and former clients.  Corina was a New York Life agent assigned to certain of Marks' former clients following Marks' resignation, including Bobby and Sharienne Wrights and Walter and Carol Little.  (Doc. 63, Exh. K, ¶ 7, PageID.1352.)  Plaintiff asserts that Corina made certain defamatory statements about Marks to the Littles and the Wrights in the course of providing advice and services to them.  The content of the allegedly defamatory statements was that Corina had stated that Marks had stolen millions of dollars, that Marks' license was suspended and would be revoked, and that Marks would almost certainly go to jail for his misdeeds as a New York Life agent.

For his part, Corina categorically denies making any such statements.  (Doc. 11, ¶¶ 84-96, 110-12.)  Bobby Wrights testified that Corina did not say anything about Marks that Wrights believed to be untrue.  (Doc. 63, Exh. C, PageID.945.)  Wrights indicated that Corina did say that "he thought Clifford Marks would lose his license" or that "he thought Clifford might lose his license," but did not say that "he thought Clifford might go to jail."  (*Id.*, PageID.955.)  Walter Little's testimony was that someone unaffiliated with New York Life (a former client of Marks' named Arthur Green) had told the Littles that Marks had been fired for stealing millions of dollars.  (Doc. 63, Exh. D, PageID.1009.)  When asked what Corina had said about the

---

various races, including African American agents.  (*Id.*, PageID.887-88.)  The specific breakdown of the agents to whom Marks' orphan clients were reassigned is not documented in the summary judgment record.

circumstances of Marks' departure, Mr. Little testified, "[H]e confirmed that Mr. Marks was no longer with the company because of some improprieties maybe that they felt had occurred." (*Id.*)  When asked if Corina had informed them that Marks had stolen millions of dollars, Mr. Little responded, "No, I don't recall him saying that." (*Id.*, PageID.1010.)  Mr. Little further testified that Corina had said that Marks' license was in peril and "[c]ould soon" be revoked. (*Id.*)  He denied that Corina had made any statement about Marks being almost certain to face jail time, but instead attributed that statement to non-party Arthur Green. (*Id.*)  Carol Little testified that she could not remember anything specific that Corina had said about Marks that she now believed to be untrue; instead, she said, "I just remember, you know, the overall gist of the conversation was very negative." (Doc. 63, Exh. E, PageID.1064.)  Upon being pressed by counsel for precise verbiage, Ms. Little testified as follows: "I cannot tell you any of his specific words. … [S]o I can't say the words he said." (*Id.*, PageID.1067.)  To the best of her recollection, Ms. Little indicated, Corina had said Marks could lose his license and could go to jail. (*Id.*)  She also came away with the impression that Marks "could go to jail," although she did not recall the specific words Marks had said. (*Id.*)  Previously, Ms. Little had testified that Corina had used the word "would," and that Marks "would almost certainly face jail time." (*Id.*, PageID.1059.)  Elsewhere in her deposition, Ms. Little testified that she "just kn[e]w he said license was going to be revoked," and that she was sure he had said it "would be" revoked. (*Id.*, PageID.1059.)  She said she could not recall with 100% certainty whether Corina had told her that Marks had stolen funds or engaged in mismanagement, and that she did not know which phrasing he had utilized. (*Id.* PageID.1058-59.)

The record is clear that (a) Marks did not lose any license to sell the products he sold as a New York Life agent; and (b) Marks did not go to jail. (Doc. 74, Exh. 6, ¶¶ 2-3, PageID.1764.)

### III.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  "If the nonmoving party fails to make 'a

sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

**IV.   Analysis of New York Life's Motion.**

As indicated, Marks has brought a single cause of action against New York Life for race discrimination, in violation of 42 U.S.C. § 1981.  Both sides' briefs invoke the familiar *McDonnell Douglas* burden-shifting framework for analyzing circumstantial claims of race discrimination under § 1981.  (Doc. 64, PageID.1468; Doc. 71, PageID.1545.)  Although Marks and New York Life agree on the proper elements of the *prima facie* test under § 1981, they disagree as to whether Marks has met his burden of establishing them.

**A.   *Plaintiff Has Not Made a* Prima Facie *Showing of Race Discrimination.***

Both Marks and New York Life agree that Marks must show the following elements in order to establish a *prima facie* case of race discrimination: (i) he is a member of a protected class, (ii) he is qualified for the position, (iii) he suffered an adverse employment action, and (iv) he was treated less favorably than a similarly situated individual outside his protected class.  *See Maynard v. Board of Regents of Div. of Universities of Florida Dep't of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003).  For purposes of summary judgment, the parties do not dispute that Marks satisfies the first and second elements.  (Doc. 64, PageID.1468; doc. 71, PageID.1545.)  The record viewed in the light most favorable to Marks likewise establishes that New York Life forced him to resign by means of coercion or duress, thereby satisfying the "adverse employment action" element.  *See, e.g., Ross v City of Perry, Ga.*, 396 Fed.Appx. 668, 670 (11th Cir. Sept. 22, 2010) ("An involuntary resignation that constitutes a constructive discharge is an adverse employment act under Title VII: a necessary element for a *prima facie* case of discriminatory discharge.") (citation omitted); *Giles v. BellSouth Telecommunications, Inc.*, 2012 WL

12898832, *4 (N.D. Ga. Dec. 10, 2012) ("An involuntary resignation may be a constructive discharge and an adverse employment action under Title VII and the ADEA.").

That leaves the fourth element, to-wit: whether Marks can identify similarly situated comparators outside his protected class.  Binding precedent holds that "[i]n order to defeat summary judgment, a Title VII plaintiff proceeding under *McDonnell Douglas* must prove … that she was treated less favorably than 'similarly situated' individuals outside her class." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1224 (11th Cir. 2019) (*en banc*).  To do so, "a plaintiff must show that she and her comparators are 'similarly situated in all material respects.'" *Id.*  "Ordinarily, … a similarly situated comparator … will have engaged in the same basic conduct (or misconduct) as the plaintiff …; … will have been subject to the same employment policy, guideline, or rule as the plaintiff …; … will ordinarily … have been under the jurisdiction of the same supervisor as the plaintiff …; and … will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.  In an effort to establish this element of the *prima facie* case, plaintiff states in generic terms that he "has provided evidence of a number of comparators who are also established agents that are 'similarly situated in all material respects.'" (Doc. 71, PageID.1547.)  However, the Court has scoured plaintiff's summary judgment response in vain for identification of any such purported comparators.  Certainly, plaintiff has neither made an evidentiary showing nor advanced any argument that might satisfy the *Lewis* test for a similarly situated individual outside Marks' protected class.[7]

---

[7]     In fact, elsewhere in his summary judgment brief plaintiff concedes that he "cannot effectively identify a comparator with the same pretextual 'performance problems' that NYL cites to." (Doc. 71, PageID.1548.)  At most, plaintiff would apparently seek to satisfy the comparator prong of the *prima facie* case of race discrimination by vague references to "fraudulent practices occurring in the Mobile office, such as holding checks written by policy holders for their premiums, customer service requests that were delayed, and held checks/payments. … None of the people committing those fraudulent acts were treated in the same manner as Marks." (*Id.*)  The only record support for this argument is an equally vague statement in Marks' Affidavit. (Doc. 72, Exh. 6, ¶ 6.)  Even assuming Marks has personal knowledge of such "fraudulent practices," no basis for which appears on the face of his Affidavit, Marks has not shown that these alleged practices are in any way comparable to the customer complaints (centered on unauthorized transactions) that resulted in his dismissal from New York Life.  He has not named any individuals (or even specified their race) in the Mobile office who he claims were responsible for these practices.  He has not shown that New York Life decisionmakers were aware of any such "fraudulent practices."  In short, even if plaintiff had submitted any proper summary judgment evidence in support of his "fraudulent practices" (Continued)

### B.      *Plaintiff Has Not Shown a Convincing Mosaic.*

Of course, a plaintiff's inability to meet the *prima facie* standard under the traditional *McDonnell Douglas* framework does not necessarily equate to a summary judgment victory for the defendant.  To the contrary, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013) (citation omitted).  And "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id.* (citation omitted).  "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements …, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  *Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citation omitted).  Marks invokes the "convincing mosaic" alternative to the *McDonnell Douglas* framework in an effort to overcome New York Life's Rule 56 Motion.

As the first tile in his mosaic, Marks says that Corina, Farrar and other New York Life officials "induced multiple clients of Marks' to submit written complaints in order to force his resignation …. This was not done with any white agents."  (Doc. 71, PageID.1548-49.)  But the summary judgment record viewed in the light most favorable to plaintiff does not reasonably lend support to this proposition as a factual matter.  Apparently, plaintiff would rely on Paragraph 13 of Marks' Affidavit, which tracks the above-quoted language closely.  (Doc. 72, Exh. 6, ¶ 13.)  There are two substantial defects with this approach.  As an initial matter, Marks identifies no basis for having personal knowledge as to what Corina and Farrar did, what their motivations might have been, or whether similar steps were or were not taken as to white agents.  *See* Rule 56(c)(4), Fed.R.Civ.P.  More importantly, Marks points to no evidence that Jones or Dean (the only two Marks clients who submitted written complaints to New York Life prior to Marks' resignation in early June 2016) were solicited, induced or otherwise compelled by

---

contention, which he has not, his showing would fall well short of the mark for the similarly situated comparator standard articulated by the Eleventh Circuit in *Lewis*.

anyone to submit written complaints about him.[8]  There is simply no evidence that New York
Life engaged in race-based solicitation of written complaints about Marks to force his
resignation.

Next, plaintiff endeavors to fashion a tile in the mosaic by lambasting what he calls
"NYL's shifting, inconsistent reasons for terminating Marks throughout this lawsuit."  (Doc. 71,
PageID.1549.)  It is, of course, true that varying explanations by an employer – if they actually
are inconsistent – can give rise to an inference of pretext.  *See, e.g., Amador v. Jones Lang
Lasalle Americas, Inc.*, 763 Fed.Appx. 821, 824 (11th Cir. Feb. 25, 2019) (explaining
"inconsistencies in an employer's rationale for the adverse action may serve as evidence of
pretext," but that "such 'inconsistencies' will only hold evidentiary weight if they are indeed
inconsistent").  The trouble with Marks' argument is that the purported "inconsistencies"
enumerated in plaintiff's summary judgment brief are not fairly classified as inconsistent
explanations.  For starters, plaintiff emphasizes that Paragraph 11(c) of Marks' "Agent's
Contract" allowed New York Life to terminate the Contract for cause "immediately upon giving
written notice of such termination to the Agent," but that no written notice was given to Marks
on June 3, 2016, when Farrar verbally informed Marks that he was being terminated.  (Doc. 71,
PageID.1550.)[9]  New York Life never stated that it was terminating Marks' Contract for cause

---

[8]      In his deposition, Marks testified that Dean told him that when he had reported his
concerns to New York Life, they had instructed Dean "to type this up and e-mail it."  (Doc. 63,
Exh. A, PageID.414.)  Of course, Marks' testimony on this point is hearsay.  Plaintiff has not
explained how it might be reduced to admissible form at trial, as required to be considered on
summary judgment; after all, Dean's sworn testimony is that he does not recall having made any
such statement to Marks.  (Doc. 63, Exh. G, PageID.1183.)  Dean expressly denied having had
"any discussions with anyone, certainly not related to New York Life, about submitting this
complaint letter."  (*Id.*, PageID.1175.)  Certainly, there is no indication in the record that Dean
ever took any steps to withdraw, rescind or modify his complaint about Marks after he submitted
it in writing to New York Life.  Thus, even if it could be reduced to admissible form, this
evidence would neither raise nor support an inference of intentional discrimination by New York
Life; rather, it would merely show that Dean expressed concerns to New York Life officials
about Marks' actions as his agent, and that Dean subsequently put those dissatisfactions in
writing at defendant's request.

[9]      Plaintiff's summary judgment brief stresses that "[t]he termination letter did not
specifically list Section 10(c) as the cause of Marks' termination; in fact, it did not indicate a
cause at all."  (Doc. 71, PageID.1550.)  But there is no Section 10(c) in Marks' Agent's Contract.
Nor was New York Life obligated to enumerate "cause" for termination because it was expressly
(Continued)

pursuant to Paragraph 11(c); indeed, it did not terminate Marks "immediately" or "for cause." Rather, the June 6, 2016 termination letter specified that Marks was being terminated under the 30-day provision of Paragraph 10 (termination without cause) with an effective date of July 6, 2016, some 30 days after the letter.  Simply put, New York Life never purported to be terminating Marks for cause, never invoked Paragraph 11(c) as the reason for termination, provided proper written notice, and specifically allowed for the 30-day period as contemplated by Paragraph 10.  Nothing about these facts and circumstances supports an inference of pretext, much less is indicative of shifting or inconsistent justifications by defendant.

Continuing with his "inconsistencies" argument, plaintiff points to an internal email dated June 7, 2016, stating that Marks was being terminated for "cumulative quality of business and suitability concerns." (Doc. 63, Exh. A, PageID.301.)  There are no apparent inconsistencies with respect to the June 7 email.  For example, New York Life completed a FINRA Form U-5 reflecting that Marks' separation from the company was because of "a number of concerns regarding the quality of his business, including unsuitable transactions." (Doc. 63, Exh. L, PageID.1399.)  Likewise, in its summary judgment brief, New York Life states that, after review of Marks' sales and practices, "it determined that Marks's contracts should be terminated based upon the complaints and other problem indicators." (Doc. 64, PageID.1463-64.)  Again, no discernible discrepancies emerge from the June 7 email.

Plaintiff also ascribes inconsistencies to "[t]he explanation and documentation given in Margaret Anderson Miller's affidavit." (Doc. 71, PageID.1550.)  Neither New York Life's 1,100-page evidentiary submission on summary judgment nor plaintiff's 100-page submission includes an affidavit from Anderson-Miller.  (Doc. 63, PageID.347; doc. 72, PageID.1568-69.)  Plaintiff provides no record citations for this proposition; therefore, the Court cannot ascertain what plaintiff might be asserting or to which exhibit he might be referring.  To be sure, there is an email authored by Anderson-Miller in the summary judgment record documenting reasons for Marks' termination; however, that exhibit is devoid of content that could plausibly be construed as a material inconsistency.  (Doc. 63, Exh. L, PageID.1409.)

---

terminating Marks' contract under the "without cause" provisions of Paragraph 10, rather than the "for cause" provisions of Paragraph 11.  Because New York Life expressly invoked the "without cause" contractual basis for termination, plaintiff's strenuous objection on summary judgment that the June 6 letter failed to specify cause for Marks' dismissal is unavailing.

Next, plaintiff asserts in bold type that New York Life's interrogatory responses "did not give an answer for why it terminated Mr. Marks." (Doc. 71, PageID.1550.) That statement is not accurate. In response to plaintiff's interrogatory asking "[s]tate each and every reason that Defendant NYL terminated or forced Plaintiff to resign," New York Life cited a variety of documents it had produced in discovery, including the Form U5, the Agency Standards Report, the Enhanced Supervision Review draft, and the Consolidated Agent Reports. (Doc. 72, Exh. 2, at #3 & #9, PageID.1600-01, 1604-05.) Those documents set forth in detail New York Life's reasons for taking the challenged personnel action as to Marks. If plaintiff believed defendant's interrogatory responses to be inadequate for referencing these exhibits rather than reproducing their contents, then the appropriate remedy was for him to file a motion to compel, which he did not do. Otherwise, the mere fact that New York Life responded to the subject interrogatory by citing documents that spelled out its reasons for terminating Marks is not probative of any inconsistency, much less discriminatory animus on the part of New York Life.

Finally, plaintiff attempts to ascribe inconsistencies to the Form U5 completed by New York Life in connection with Marks' dismissal. The critical portion of the form for purposes of this litigation is under the heading "Termination Explanation." In that section, New York Life explained that Marks had resigned "after a review of his business practices raised a number of concerns regarding the quality of his business, including unsuitable transactions. The review was initiated after receipt of a customer complaint, which alleged unauthorized loan and withdrawal transactions relating to traditional life insurance policies." (Doc. 63, Exh. L, PageID.1399.) There is nothing inconsistent between defendant's explanation of the reasons for Marks' dismissal as specified in the Form U5, and its stance in this litigation.[10]

---

[10]    Rather than looking at the "Termination Explanation," plaintiff endeavors to conjure up inconsistency by reference to a section in the Form U5 labeled "Internal Review Disclosure," in which New York Life responded "No" to a question as to whether Marks had been "under internal review for fraud or wrongful taking of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct." (Doc. 63, Exh. L, PageID.1400.) That plaintiff disagrees with the manner in which New York Life characterized the <u>nature</u> of its review of Marks' business practices does not establish any material inconsistency in defendant's stated <u>reasons</u> for terminating Marks; therefore, this argument does nothing to advance plaintiff's "convincing mosaic" theory of proof. This is particularly true given that elsewhere in the very same Form U5, New York Life answered "Yes" to the question of whether Marks had been permitted to resign after allegations that he had been "violating (Continued)

For all of these reasons, the Court rejects plaintiff's "convincing mosaic" theory for overcoming summary judgment, as described on pages 25-28 of his brief.

### C.    Plaintiff and "But-For" Causation / Pretext.

Plaintiff devotes the remainder of his brief to arguing that New York Life's Motion for Summary Judgment should be denied because he has shown that race was the "but-for" cause for his termination based on "a multitude of pretextual reasons." (Doc. 71, PageID.1551.) Although plaintiff does not define the legal framework in which this argument fits, it appears his position is that (a) if *McDonnell Douglas* applies and if he has satisfied the elements of a *prima facie* case, then he has shown sufficient evidence of pretext to withstand summary judgment; and (b) if the "convincing mosaic" standard applies, then his evidence of pretext is also sufficient circumstantial evidence to allow a jury to infer intentional discrimination. Either way, the Court finds Marks' "pretext" showing insufficient to enable a reasonable finder of fact to determine that race was the "but-for" cause of New York Life's decision to terminate his agent contracts.

Both sides agree that "but-for" causation is the appropriate standard for § 1981 claims. *See, e.g., Comcast Corp. v. National Ass'n of African American-Owned Media*, --- U.S. ----, 140 S.Ct. 1009, 1019, 206 L.Ed.2d 356 (2020) ("All the traditional tools of statutory interpretation persuade us that § 1981 follows the usual rules, not any exception. To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). The Supreme Court has recently elaborated that "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton County, Georgia*, --- U.S. ----, 140 S.Ct. 1731, 1739, 207 L.Ed.2d 218 (2020). Thus, the appropriate inquiry is whether plaintiff's summary judgment showing would allow a reasonable factfinder could conclude that if his race had not been African American (*i.e.*, if his race were the one thing that changed), then New York Life would not have terminated his contracts.[11]

---

*investment-related* statutes, regulations, rules or industry standards of conduct." (Doc. 63, Exh. L, PageID.1402.) The reasons for termination as specified by defendant in the Form U5 are both internally consistent and fully conforming to the reasons given by New York Life in other exhibits and in its litigation position delineated on summary judgment.

[11]    Plaintiff would carry the logic and implications of *Bostock* much further, as he argues that the *Bostock* discussion of "but-for" causation "effectively destroys the *McDonnell* (Continued)

Plaintiff cites "a multitude of pretextual factors that indicate NYL terminated or forced out Marks for discriminatory reasons." (Doc. 71, PageID.1555.)  First, plaintiff cites double-hearsay testimony that someone named Tyson Lee called him and told him that someone named Thomas Craig Stephens had told Lee that unidentified persons at New York Life had informed Stephens that the company was "going to make sure they got" Marks. (*Id.*, PageID.1555-56.)  Plaintiff has not identified any means of reducing this facially inadmissible evidence to admissible form for trial; therefore, the Court does not consider it on summary judgment.  Second, plaintiff asserts that African American agents received inferior training opportunities at New York Life. (*Id.*, PageID.1556.)  In his deposition, when Marks was asked "what do you know about training of other African American agents that was any different from agents at large," his response was "[n]one that I know specifically" other than a couple of items of training that he had received but that other African American agents had not. (Doc. 63, Exh. A, PageID.403.)[12]  With respect to his own experiences, Marks readily admitted that he "had better training than a number of other people." (*Id.*, PageID.404.)  Taking Marks' testimony on this point in the aggregate, a reasonable finder of fact could not conclude that New York Life intentionally discriminated against African American agents as to training opportunities, particularly given Marks' testimony that, if anything, he received preferential training opportunities relative to other agents; therefore, this purported evidence of pretext is unhelpful.

---

*Douglas* burden-shifting framework." (Doc. 71, PageID.1554 (citation omitted).)  The Court need not and does not wade into analysis of that proposition in order to resolve fully the pending Rule 56 Motion; rather, the Court simply examines the evidence of pretext proffered by Marks and explores whether it supports a reasonable inference that plaintiff's race was a but-for cause of the challenged adverse employment action.

[12]     Moreover, Marks acknowledged that there were valid business reasons why other agents had not received that training.  For example, Marks testified that he was offered "coaching series" training while other African American agents were not; however, he conceded that he had to reach a certain level of production to be eligible for the coaching series and then had to pay out-of-pocket for that training. (*Id.*)  Likewise, as to an "American College" training program, Marks explained that "that's a designation that you have to study to get and go. … So a lot of the agents that I know, which were African Americans, would not push to even get those designations." (*Id.*, PageID.403-04.)  Marks' own testimony thus undercuts his assertion that African American agents were offered systematically inferior training opportunities at New York Life because of race.

-15-

Third, plaintiff cites the opinions of two of his former clients, Ellis Harper and Carol Little, that "Marks, as a black agent, had to work harder to keep up." (Doc. 71, PageID.1556.) Of course, Harper and Ms. Little are outsiders to New York Life who identified no factual basis for personal knowledge about the relative treatment by New York Life of Marks vis a vis other agents. At most, then, plaintiff is asking the Court to rely on unfounded speculation and baseless extrapolation from these witnesses linking their own subjective perceptions of the African American experience in the business community at large to Marks' treatment at the hands of New York Life.[13] This evidence is not admissible and is not capable of being reduced to admissible form at trial; therefore, it will not be considered in the pretext calculus on summary judgment.

Fourth, Marks quarrels with the Dean and Jones complaints. (Doc. 71, PageID.1557-58.) Dean's letter of complaint is clear that (i) Marks required him to sign blank forms; (ii) although Dean had met with Marks for the purpose of reducing his monthly payment, Marks actually established a new policy for him that he did not request with a $930 monthly premium that he could not afford; (iii) Marks had made unauthorized transactions to and from Dean's account; and (iv) based on these experiences, Dean "no longer want[s] to deal with Clifford Marks as [his] agent." (Doc. 63, Exh. G, PageID.1201.) Furthermore, after New York Life reviewed Dean's concerns, it wrote him a letter offering to rescind the policy and use the rescission proceeds to reduce the outstanding loan balance. (*Id.*, PageID.1202.) While Marks may disagree with the substance of Dean's complaint, he cannot reasonably dispute that New York Life investigated it and found it to be viable to the point of offering affirmative relief to Dean to resolve the issue.

---

[13]    In particular, Harper indicated that "as a black man with personal experience not receiving help … in the sales industry because of his race, he could understand Mark's [*sic*] perspective, and he could see how Marks' white coworkers could be jealous of a black agent as successful as Marks." (Doc. 71, PageID.1556.) Of course, Harper lacked personal knowledge of whether New York Life did or did not provide help and resources to Marks, and likewise had no personal knowledge as to how Marks' white colleagues felt about him. Such overt conjecture and guesswork are patently inadmissible and are not probative in the slightest as to whether New York Life's treatment of Marks was racially motivated. Similarly, Ms. Little's testimony that New York Life was treating Marks differently because of race boiled down to her general observation that "sometimes when African Americans are succeeding – and [Marks] always showed me his awards and how he was doing really well – that people who are not of color are suspicious." (*Id.*, PageID.1557.) This testimony is not evidence of racially discriminatory treatment by New York Life toward Marks and would not be admissible at trial for that purpose.

There is no evidence of pretext to be gleaned from New York Life's handling, analysis, and disposition of Dean's unsolicited written complaint against Marks. The same is true of Wendell Jones' complaint against Marks. To be sure, the Court understands that Marks generally "disputed Jones' allegations in his deposition and denies responsibility for the alleged unauthorized transactions." (Doc. 71, PageID.1558.) But plaintiff offers no explanation and no evidentiary support for his apparent position that New York Life's decision to credit Jones' complaint over Marks' blanket denial of responsibility, and to refund the challenged premiums to Jones in response to his complaint, was a pretext for race discrimination against Marks.

Fifth and finally, plaintiff endeavors to establish pretext and a jury question of "but-for" causation by reference to New York Life's handling of four post-termination complaints it received from Marks' former clients. Although summary judgment briefing bogs down on this topic, the salient facts concerning these complaints are straightforward. Following Marks' resignation, New York Life sent routine audit letters to his former clients, in accordance with its standard practice, notifying the clients that Marks was no longer with the firm and requesting that they contact New York Life if they had any concerns about Marks' service. Certainly, the transmission of these audit letters did not evince racially disparate treatment of Marks by New York Life. Several of Marks' clients stepped forward by contacting New York Life with serious complaints about Marks in the months after his dismissal.[14] In each instance, New York Life reviewed the complaint and, after review, paid out (or offered to pay out) tens of thousands of dollars in premium refunds and other payments to the clients in order to resolve their issues.

It is not clear how exactly these post-termination client complaints factor into Marks' pretext argument. Apparently, plaintiff would point to these client complaints as evidence of

---

[14]   In a letter dated September 14, 2016, Ellis Harper complained to New York Life in writing "of being targeted and taken advantage of by your agent Clifford Marks." (Doc. 63, Exh. F, PageID.1156.)  In November 2016, Walter Little sent New York Life a letter objecting to "the reckless manner my life insurance policy was managed by your company" and indicating that "[m]y account was horribly mishandled by Mr. Marks." (Doc. 63, Exh. E, PageID.1107.) On January 16, 2017, Bobby Wrights sent a letter to New York Life expressing his desire "to formally lodge a complaint against a former New York Life agent, Clifford Marks," and expressing dismay that "[w]e trusted New York Life's representative [Marks] and are much worse off for it." (Doc. 63, Exh. C, PageID.990.)  And Riji Dixon contacted New York Life to request rescission of his policies and return of his funds, although he later clarified that he did not intend to voice any complaints concerning Marks. (Doc. 63, Exh. H, PageID.1246.)

pretext by asserting that New York Life somehow misled or tricked the clients into making their complaints, that Marks denies wrongdoing in connection with those complaints, and that in June 2018, FINRA closed its file on these complaints without any express finding of wrongdoing by Marks.  But these arguments do not support a conclusion that New York Life's stated reasons for terminating Marks' contracts were a pretext for race discrimination.  After all, the audit letters that spawned most of the complaints were routine practice and procedure for New York Life after an agent's dismissal.  With the exception of Riji Dixon, the complaining individuals knowingly and purposefully signed written complaints against Marks.  In reducing those client concerns to writing and reporting them to FINRA, New York Life was adhering to its clear policies, practices and regulatory requirements.  (Doc. 63, Exh. L, ¶ 12, PageID.1386.)  New York Life offered and/or paid substantial sums of money to all four sets of complaining clients to resolve their concerns, and none of them ever reimbursed those funds to New York Life or indicated a belief that their complaints were not valid.[15]  And FINRA's evaluation and assessment of those client complaints is not evidence of anything.[16]  Simply put, nothing about the post-termination client complaints about Marks that New York Life received and reported to FINRA would support a reasonable inference that defendant's stated reasons for parting ways

---

[15]     Walter Little, for example, expressly testified that he believed his written complaint was legitimate and that he continued to "stand behind" it at the time of his deposition in this case. (Doc. 63, Exh. D, PageID.1013.)

[16]     On this last point, plaintiff repeatedly emphasizes in his brief (including multiple times in bold type) that those complaints were dismissed by FINRA with a finding of no wrongdoing.  (Doc. 71, PageID.1526-27, 1538, 1543, 1547, 1551, 1565.)  However, that characterization is unfair, irrelevant, and ultimately inadmissible.  After all, the FINRA letter to Marks dated June 7, 2018 contains no formal findings or substantive conclusions exonerating Marks of anything, much less finding any culpability or impropriety by New York Life in reporting those complaints; rather, it merely indicates that "FINRA has completed a review" of the customer complaints reported by New York Life and "we have determined to close our file." (Doc. 72, Exh. 7, PageID.1654.)  The letter emphasizes FINRA's stance that its determination not to take action against Marks "has no evidentiary weight in any mediation, arbitration, or judicial proceeding," and that any attempt by Marks to attempt to introduce that determination into evidence in a judicial proceeding would be "inconsistent with just and equitable principles of trade."  (*Id.*)  Plaintiff disregards all of these caveats and limitations prominently featured on the face of the FINRA letter.  Besides, in reporting those complaints to FINRA, New York Life was doing nothing more than complying with regulatory requirements and internal procedures.

with Marks months before the complaints were made were pretextual and that the real reason was racial discrimination.[17]

In sum, regardless of whether plaintiff travels under the *McDonnell Douglas* burden-shifting framework or the "convincing mosaic" of circumstantial evidence, the Court finds on this record that no reasonable finder of fact could conclude that New York Life's stated reasons for the challenged personnel action were pretext for unlawful race discrimination. Stated differently, plaintiff has not shown the existence of a genuine issue of material fact that his race was a but-for cause of New York Life's decision to terminate his agent contracts. Accordingly, plaintiff's race discrimination claim brought pursuant to 42 U.S.C. § 1981 cannot survive summary judgment. Defendant New York Life's Motion for Summary Judgment is properly **granted** at this time.

## V.    Analysis of Corina's Motion.

As noted, Marks is asserting claims against not only New York Life, but also a former colleague named Freddie Corina. Marks brings a single state-law cause of action against Corina for defamation. Specifically, Marks alleges that Corina made "false, incorrect, misleading and disparaging statements" that "were designed to disparage Plaintiff, reflect poorly on him, cast him in a false light, justify his termination, and destroy his career as an insurance agent." (Doc. 1, ¶ 110, PageID.33.) According to the Complaint, "Corina's malicious and defamatory actions have sullied Plaintiff's good name and emptied his bank account." (*Id.*, ¶ 111.) The specific alleged statements identified by the pleadings as the basis for Marks' defamation claim are as

---

[17]       In his summary judgment brief, plaintiff also suggests that the complaining clients "have indicated that Farrar and Corina had a discriminatory animus for inducing them to bring these complaints in the first place." (Doc. 71, PageID.1565.) Upon careful review of plaintiff's evidentiary submission, the Court concludes that reasonable finder of fact could not conclude that Corina and Farrar dealt with the post-termination client complaints in a manner that evinced race-based discriminatory animus against Marks. Plaintiff once again seeks to build inferences of racial animus on summary judgment that the record evidence cannot reasonably bear. For example, Dixon testified in his deposition that Farrar made a comment that the house Marks was building was "way too big" and that he didn't "believe he will ever be able to build it," which struck Dixon as "a little discriminatory" because "it just didn't hit me right." (Doc. 63, Exh. H, PageID.1218.) In the next breath, however, Dixon acknowledged that Farrar did not say anything about race during their entire conversation, but that "obviously he was irritated at" Marks. (*Id.*) This testimony, and the other testimony by the complaining ex-clients of Marks, does not create a triable issue as to whether Marks' race was a but-for cause of New York Life's decision to terminate Marks' contracts.

follows: (i) Corina allegedly told Marks' former clients Walter and Carol Little that Marks had "stolen millions of dollars" (doc. 1, ¶ 83); (ii) Corina allegedly told the Littles that "Marks' license was in peril and was suspended and would be revoked" (*id.*, ¶ 84); (iii) Corina allegedly told the Littles that "Marks would almost certainly face jail time because of his unscrupulous dealings" (*id.*); and (iv) Corina may have made similar statements to Marks' former clients Bobby and Sharienne Wrights (*id.*, ¶¶ 91-96.)  Corina now moves for summary judgment on the defamation cause of action.

Under Alabama law, "To establish a *prima facie* case of defamation, the plaintiff must show [1] that the defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable *per se*) or actionable upon allegations and proof of special harm (actionable *per quod*)."  *Delta Health Group, Inc. v. Stafford*, 887 So.2d 887, 895 (Ala. 2004) (citation omitted).  "True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment."  *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citations omitted).  Defendant Corina's position is that Marks cannot present a viable defamation claim against him because the statements in question were statements of opinion and therefore not defamatory, and because any defamatory statements by Corina were subject to a qualified privilege.[18]

It is well settled that "[o]ne cannot recover in a defamation action because of another's expression of an opinion based upon disclosed, nondefamatory facts, no matter how derogatory the expression may be."  *Sanders v. Smitherman*, 776 So.2d 68, 74 (Ala. 2000).  Under Alabama

---

[18]    Defendant also advances an argument that the allegedly defamatory statements by Corina to the Littles were not "published" within the meaning of applicable law.  Defendant is correct, of course, that "[p]ublication requires communication of the defaming statement to … a … third party."  *Southbark, Inc. v. Mobile County Com'n*, 974 F. Supp.2d 1372, 1381-82 (S.D. Ala. 2013).  But the Littles are undoubtedly third parties.  In arguing no evidence of publication, Corina would lean heavily on *Brackin v. Trimmier Law Firm*, 897 So.2d 207 (Ala. 2004); however, *Brackin* is distinguishable on its face.  In *Brackin*, the Alabama Supreme Court concluded that there was no publication of statements by a credit union defendant's employees to the credit union's agent (an attorney performing an investigation on behalf of the credit union) within the scope of his agency.  The *Brackin* scenario bears no resemblance to the facts of this case; therefore, that court's "no-publication" conclusion carries no persuasive weight here. Without question, Corina's statements were made to third parties, thereby satisfying the publication element of a defamation claim as a matter of law.

law, the determination of whether a communication is an expression of opinion is a question of law for the court. *See Bell v. Smith*, 281 So.3d 1247, 1253 (Ala. 2019) ("Bell also argues that the determination of whether a communication is an expression of opinion or purports to be a statement of fact is a question of fact that should be submitted to a jury rather than a question of law for the court. … [T]he law does not support Bell's argument."). Many of the purportedly defamatory statements identified by Marks as grounds for his claim against Corina are plainly statements of opinion, including (i) Corina's statement to Bobby Wrights that Corina "thought Clifford Marks would lose his license" or that he "thought Clifford might lose his license;" (ii) Corina's statement to Walter Little that Marks' license "[c]ould soon" be revoked; and (iii) Corina's apparent statements to Carol Little that he thought Marks could lose his license and could go to jail. These statements – and any others like them by Corina – are statements of opinion that are not actionable; indeed, they are protected from defamation actions by the First Amendment.[19] Plaintiff offers no effective rebuttal to defendant's summary judgment argument on this point.

That said, there is one category of statements by Corina that conceivably sweeps outside the scope of the opinion defense. Specifically, plaintiff points to Ms. Little's testimony that Corina had informed her that Marks "would almost certainly face jail time" and that his license "would be revoked." As an initial matter, Ms. Little's deposition was riddled with equivocation, hedging and inconsistencies about the precise language utilized by Corina. While in some instances she professed to recall exactly what he said, Ms. Little often doubled back on herself, injecting uncertainty and ambiguity into her testimony by acknowledging, for example, "I cannot tell you any of his specific words. … [S]o I can't say the words he said." (*Id.*, PageID.1067.) Assuming that a reasonable factfinder could conclude from Ms. Little's testimony in the aggregate that Corina actually did tell her that Marks "would almost certainly face jail time" and that his license "would be revoked," such statements are arguably not statements of opinion. Indeed, these statements could be interpreted as stating or implying actual facts about Marks, so

---

[19]     Likewise, Corina's statement to Walter Little confirming that "Mr. Marks was no longer with the company because of some improprieties maybe that they felt had occurred" is not false at all, and therefore cannot form the basis for a viable defamation claim. *See, e.g., Federal Credit, Inc. v. Fuller*, 72 So.3d 5, 10 (Ala. 2011) ("Truth is a complete and absolute defense to defamation. … Truthful statements cannot, as a matter of law, have a defamatory meaning.") (citations omitted).

as to be actionable in defamation even if they were couched as mere statements of opinion. *See, e.g., Deeb v. Saati*, 778 Fed.Appx. 683, 687 (11th Cir. June 20, 2019) ("If a statement can reasonably be interpreted as stating or implying actual facts about the plaintiff, … the statement may be actionable even if it is phrased as an opinion.") (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)).

Assuming that Corina's "would" statements to Ms. Little actually happened, and that they were statements implying actual facts about Marks, defendant's fallback position is to invoke the doctrine of qualified privilege.  The Alabama Supreme Court has recognized a conditional privilege even for communications that tend to defame or disparage a person, "[w]here a party makes a communication, and such communication is prompted by duty owed either to the public or to a third party. … The duty under which the party is privileged to make the communication need not be one having the force of legal obligation, but it is sufficient if it is … moral in its nature …." *Brackin*, 897 So.2d at 224 (citation omitted).  Corina made the challenged statements to Ms. Little in his role as an agent of New York Life, indeed as the agent assigned to the Littles' account, with a responsibility to try to resolve the Littles' expressions of dissatisfaction and claims for relief based on Marks' handling of their insurance accounts.  Given this context, defendant persuasively argues that Corina had at least a moral duty of disclosure to communicate to the Littles what he knew and what he thought about Marks' circumstances, so that the Littles could determine what course of action they deemed appropriate with their complaints to New York Life.  *See generally Berkel and Co. Contractors, Inc. v. Providence Hosp.*, 454 So.2d 496, 505 (Ala. 1984) ("A duty to speak depends upon the relation of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances. … [E]ach case must be individually examined to determine whether a duty of disclosure exists.") (citations omitted).  Under Alabama law, "[a] plaintiff cannot prevail against an established defense of qualified [or conditional] privilege unless he has pleaded and proved defamation committed with actual malice." *Brackin*, 897 So.2d at 224 (citation omitted).

Faced with Corina's argument of qualified privilege, plaintiff remains silent.  He offers no response to defendant's contention that Corina's "would" statements to Ms. Little were conditionally privileged.  He does not question or rebut defendant's argument that Corina was under at least a moral duty of disclosure to Marks' former clients to discuss what he knew and believed about Marks' status to answer those clients' questions, resolve their complaints about

Marks, and assist them in determining what steps to take in pursuing their claims of unauthorized and/or unfair treatment by Marks in handling their policies and accounts.[20]  And plaintiff undertakes no effort to make the requisite showing that he has pleaded or can prove actual malice in connection with those statements, so as to overcome any qualified privilege that might attach. The Court is under no obligation to formulate plaintiff's summary judgment arguments for him, and declines to do so.  *See, e.g., Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. … Rather, the onus is upon the parties to formulate arguments ….") (citations omitted).  Accordingly, plaintiff's attempt to proceed on his defamation claim against Corina on the basis of the latter's "would" statements to Ms. Little fails on the ground of qualified privilege, even assuming that (i) a reasonable finder of fact could conclude that Corina actually made the "would" statements, despite the equivocation and ambiguity in Ms. Little's deposition testimony; and (ii) the "would" statements were not insulated from defamation proceedings as statements of opinion.

Even if none of the aforementioned defects existed, plaintiff's defamation theory against Corina would still be fatally flawed.  Plaintiff's brief is replete with arguments that "Corina used defamatory statements to induce[] complaints from Marks' clients in order to force him to resign based on racial animus." (Doc. 73, PageID.1699.)  He postures his defamation claim as being that "Corina made defamatory statements to Marks' clients.  … Based on the untrue statements, Marks lost his job."  (*Id.*, PageID.1700.)  This entire theory underlying his defamation claim (*i.e.*, that Corina defamed Marks to his clients to induce them to file complaints so that New York Life could force Marks to resign) is counterfactual on its face.  The timing is all wrong. Recall that it is undisputed that New York Life made the determination to terminate Marks' clients on May 25, 2016.  At that point, the <u>only</u> client complaints received by New York Life were from Jones and Dean.  Plaintiff has identified no allegedly defamatory statements made by Corina to either of these former clients of Marks.  The Littles – on whom Marks' defamation

---

[20]     In his summary judgment brief, plaintiff makes only passing reference to *Brackin*, stating that Corina's reliance on it is "inappropriate because nothing in NYL's policies and procedures allows its agents to induce complaints from clients through defamatory statements in order to force their resignations for discriminatory purposes."  (Doc. 73, PageID.1699.) Plaintiff's statement misses the point of defendant's citation to *Brackin* and fails to address the conditional privilege issue.

claim is principally focused – made their written complaint to New York Life in November 2016, five months after Marks resigned from the company.  Wrights' complaint to New York Life about Marks was dated January 2017, seven months after Marks resigned from the company.  As such, plaintiff's contention that (i) Corina made defamatory statements about him to the Littles and the Wrights, (ii) to induce them to lodge internal complaints against Marks, and (iii) thereby caused Marks to lose his job is demonstrably inaccurate.  Marks' contracts at New York Life were terminated many months before the subject complaints were ever made, and the allegedly defamatory statements plainly postdated Marks' departure from New York Life by a wide margin.  Thus, plaintiff's defamation claim as framed in his brief is irreconcilable with uncontroverted facts concerning the timing and sequence of events.

In light of the above, the Court agrees with defendant that plaintiff's defamation claim fails as a matter of law.  There being no genuine issues of material fact, defendant Corina's Motion for Summary Judgment is properly **granted**.

VI.   **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.   Defendant New York Life Insurance Company's Motion for Summary Judgment (doc. 64) is **granted**, and plaintiff's 42 U.S.C. § 1981 claim against defendant New York Life is **dismissed with prejudice**;

2.   Defendant Alfred Corina's Motion for Summary Judgment (doc. 65) is **granted**, and plaintiff's defamation claim against defendant Corina is **dismissed with prejudice**;

3.   There being no further claims in this action involving defendant Corina, the Clerk's Office is **directed** to terminate Alfred Freddie Corina as a party to these proceedings;

4.   This action remains pending as to New York Life's Counterclaim against Marks for breach of contract (*see* doc. 9); and

5.   The Final Pretrial Conference remains set for **October 20, 2020 at 10:00 a.m.**, with jury selection to follow on **October 27, 2020**.

DONE and ORDERED this 24th day of September, 2020.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE